**2026 WI 22**

# Supreme Court of Wisconsin



STATE OF WISCONSIN,
*Plaintiff-Respondent-Petitioner*,

*v.*

N.K.B.,
*Defendant-Appellant*.

No. 2023AP722-CR
Decided June 26, 2026

REVIEW of a decision of the Court of Appeals
Milwaukee County Circuit Court (David C. Swanson, J.) No.
2023CF1417

REBECCA FRANK DALLET, J., delivered the majority opinion of the Court, in which JILL J. KAROFSKY, C.J., and BRIAN K. HAGEDORN, JANET C. PROTASIEWICZ, and SUSAN M. CRAWFORD, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion. ANNETTE KINGSLAND ZIEGLER, J., filed a dissenting opinion.

¶1 REBECCA FRANK DALLET, J. Although Naomi[1] was involuntarily committed only for treatment to restore her competency to

---

[1] For ease of reading and to protect the confidentiality of these proceedings, we use the pseudonym "Naomi" to refer to the defendant in this case.

stand trial under WIS. STAT. § 971.14 (2021–22),[2] the circuit court ordered that she be involuntarily medicated to alleviate the danger she posed to herself or others. The question presented is whether WIS. STAT. § 51.61(1)(g)3. authorizes that involuntary medication order. We hold that it does not.

I

¶2 Naomi was charged with felony battery by a prisoner for slapping a nurse while she was an inmate at the Milwaukee County jail. *See* WIS. STAT. § 940.20(1). At an initial appearance, Naomi's counsel advised the circuit court that Naomi might be incompetent to proceed, and the circuit court accordingly ordered that Naomi undergo an examination to assess her competency. *See generally* WIS. STAT. § 971.14; *see also* WIS. STAT. § 971.13.[3] The Department of Health Services (DHS) also requested a hearing to determine whether Naomi was competent to refuse medication and, if not, whether she should be involuntarily medicated to restore her competency.[4]

---

[2] All subsequent references to the Wisconsin Statutes are to the 2021–22 version unless otherwise indicated.

[3] A criminal defendant "who lacks substantial mental capacity to understand the proceedings or assist in his or her own defense" may not be tried, convicted, or sentenced for an offense "so long as the incapacity endures." WIS. STAT. § 971.13(1). A circuit court proceeds under WIS. STAT. § 971.14 "[w]henever there is reason to doubt a defendant's competency." § 971.14(1r)(a). That section provides for examination of the defendant, submission of a written report, and the opportunity for an evidentiary hearing. § 971.14(2)–(4). If the court finds "that the defendant is not competent but is likely to become competent . . . if provided with appropriate treatment," then it "shall suspend the proceedings and commit the defendant to the custody of the [Department of Health Services] for treatment." § 971.14(5)(a)1.

[4] If certain findings are made, a circuit court may order the involuntary medication of an incompetent defendant to restore their competency to proceed. *See* § 971.14(4)(b), (5)(am) (requiring a finding that the defendant is not competent to refuse medication); *State v. Fitzgerald*, 2019 WI 69, ¶2, 387 Wis. 2d 384, 929 N.W.2d 165 (holding that a circuit court must make the findings required by *Sell v. United States*, 539 U.S. 166 (2003), before ordering involuntary medication to restore competency).

¶3    At the competency hearing, the circuit court found Naomi incompetent to proceed but likely to regain competency with treatment, and committed Naomi to DHS's custody. The circuit court also found that Naomi was incompetent to refuse medication and that the factors set forth in *Sell v. United States*, 539 U.S. 166 (2003), were met,[5] and thus ordered that Naomi be involuntarily medicated. Naomi filed a notice of appeal, and the circuit court stayed its involuntary medication order. The next day, DHS wrote a letter to the court asking it to reconsider the stay because, according to DHS, Naomi posed a danger to herself or others without the medication.

¶4    Following another hearing, the circuit court determined that Naomi was dangerous to herself and others and that she was not competent to make her own medication decisions. The circuit court then vacated its prior involuntary medication order and ordered that Naomi be involuntarily medicated "on grounds of dangerousness." In doing so, the circuit court underscored that it was imposing a new involuntary medication order based on Naomi's dangerousness, rather than the need to restore her competency, and that it therefore "did not need to and should not reach the *Sell* factors."[6]

---

[5] In *Sell*, the United States Supreme Court held that the government may involuntarily medicate a criminal defendant for the purpose of restoring the defendant's competency only if the court makes the following findings: (1) important governmental interests are at stake; (2) involuntary medication will significantly further those interests; (3) involuntary medication is necessary to further those interests; and (4) administration of the medication is medically appropriate. 539 U.S. 166, 180–81. A circuit court must make these findings before ordering involuntary medication to restore competency under § 971.14. *Fitzgerald*, 387 Wis. 2d 384, ¶2.

[6] When entering this new order for involuntary medication, the circuit court used the September 2022 version of form CR-206. That version provided for two alternative grounds to order involuntary medication for an individual committed under § 971.14: dangerousness or the individual's need to regain competency to proceed. The form has since been updated, and the current version, dated December 2024, no longer includes dangerousness as a ground for ordering involuntary medication.

¶5 Naomi appealed, arguing that the circuit court did not have legal authority to order that an individual committed only for competency restoration under § 971.14 be involuntarily medicated upon a finding of dangerousness. The court of appeals agreed with Naomi. *State v. N.K.B.*, 2024 WI App 63, ¶20, 414 Wis. 2d 218, 14 N.W.3d 681. In its decision, it considered and rejected several proposed sources of legal authority offered by the State, including WIS. STAT. § 51.61(1)(g)1. and 3., § 971.14(2)(f), and two decisions by the United States Supreme Court: *Washington v. Harper*, 494 U.S. 210 (1990), and *Sell*, 539 U.S. 166. *See N.K.B.*, 414 Wis. 2d 218, ¶¶22, 29–31, 41–42. Before this court, the State relies exclusively on a portion of § 51.61(1)(g)3. as the source of authority for the circuit court's order.

II

¶6 The interpretation of WIS. STAT. §§ 51.61(1)(g)3. and 971.14 is a question of law that this court reviews de novo. *State v. Anthony D.B.*, 2000 WI 94, ¶8, 237 Wis. 2d 1, 614 N.W.2d 435.

III

¶7 A circuit court must have statutory authority to order the involuntary medication of a committed individual. *Id.*, ¶24. WISCONSIN STAT. § 971.14 does not grant statutory authority for the order at issue here, and the State does not argue otherwise. That is because the language of § 971.14 provides for court-ordered involuntary medication only to restore competency, and not because a defendant is found to be dangerous.[7] The State instead argues that a portion of WIS. STAT. § 51.61(1)(g)3. authorizes the involuntary medication order in this case. Naomi responds that the language, context, and statutory history of § 51.61(1)(g)3., as well as our existing case law, demonstrate that the relevant portion of § 51.61(1)(g)3. does not permit a circuit court to order

---

[7] Section 971.14(5)(a)1. (emphasis added) states that a defendant shall be committed to the custody of DHS for treatment if a "court determines that the defendant is not competent *but is likely to become competent . . . if provided with appropriate treatment*." This provision makes clear that the purpose of the treatment permitted by § 971.14, which may include court-ordered involuntary medication when additional requirements are met, is to restore the defendant's competency to proceed.

involuntary medication for an individual committed exclusively under § 971.14.[8] We agree with Naomi.

¶8      We begin with the text of § 51.61(1)(g)3. *See Meyers v. DNR*, 2019 WI 5, ¶18, 385 Wis. 2d 176, 922 N.W.2d 47 ("Statutory interpretation begins with the language of the statute."). Section 51.61(1) sets forth various rights that "shall" be afforded to "each patient." "Patient" is defined as "any individual who is receiving services for mental illness, developmental disabilities, alcoholism or drug dependency," and includes individuals like Naomi who are committed under chapter 971. § 51.61(1). The subdivision at issue, § 51.61(1)(g)3., affords each patient "the right to exercise informed consent with regard to all medication" after a final commitment order unless one of two exceptions applies: (1) "the committing court or the court in the county in which the individual is located . . . makes a determination, following a hearing, that the individual is not competent to refuse medication;" or (2) "a situation exists in which the medication or treatment is necessary to prevent serious physical harm to the individual or others." § 51.61(1)(g)3. The State relies exclusively on the first exception. Because individuals committed under § 971.14 are included in the definition of "patient," this exception appears at first glance to authorize a circuit court to determine that an individual committed under that section is not competent to refuse medication.

¶9      When determining whether the first exception in § 51.61(1)(g)3. authorizes court-ordered involuntary medication for an individual committed exclusively under § 971.14, we cannot read § 51.61(1)(g)3. in isolation. Rather, we must interpret the first exception in § 51.61(1)(g)3. in light of context provided by related provisions. *See Clean Wis., Inc. v. DNR*, 2021 WI 72, ¶10, 398 Wis. 2d 433, 961 N.W.2d 611. Here, that context includes § 971.14, which contains its own process for a circuit court to determine that an individual committed for competency restoration is not competent to refuse medication. And while that determination is subject to the same procedural and substantive

---

[8] Naomi was committed exclusively under § 971.14. Parallel commitments, however, are possible. *See infra*, ¶14. Our conclusion in this case does not address a situation in which there is a parallel commitment or in which an individual is committed under a statute other than § 971.14.

requirements as a determination under § 51.61(1)(g)3.,[9] § 971.14 imposes additional requirements. Those requirements include a mandate that the motion for involuntary medication be based on the report of a licensed physician,[10] that the State bears the burden of proof by clear and convincing evidence, and that the order for involuntary medication must state that "whoever administers the medication or treatment to the defendant shall observe appropriate medical standards." § 971.14(4)(b). Finally, whereas § 51.61(1)(g)3.'s first exception does not address the grounds for court-ordered involuntary medication, § 971.14 is clear that any treatment provided to individuals committed under that section is for the purpose of restoring their competency to proceed. *See supra,* ¶7 n.7.

¶10    We conclude that the best way to read § 51.61(1)(g)3. in light of § 971.14's separate, and more rigorous, process is that § 51.61(1)(g)3.'s first exception does not apply to individuals committed exclusively under § 971.14. After all, there would be no reason to enact a separate process for individuals committed under § 971.14 alone, subject to additional procedural and substantive requirements, if § 51.61(1)(g)3.'s less rigorous process continued to apply to those same individuals. If that were the case, the additional requirements of § 971.14 would be essentially be dead letter, since the State could always avoid them by proceeding under § 51.61(1)(g)3. whenever it sought a determination that an individual committed under § 971.14 was not competent to refuse medication. To avoid that outcome, we must read these statutes "dealing with the same matter . . . in harmony such that each has force and effect." *Belding v. Demoulin,* 2014 WI 8, ¶17, 352 Wis. 2d 359, 843 N.W.2d 373. In other words, we must conclude that § 51.61(1)(g)3. does not authorize court-

---

[9] Those requirements include the filing of a motion, provision of notice to the subject individual and their counsel, a hearing within ten days of the motion's filing, and a determination that the individual is not competent to refuse medication. *See* §§ 971.14(5)(am), 51.61(1)(g)3. The court's determination that the individual is not competent to refuse medication is also subject to the same standard under both statutes. *See* §§ 971.14(3)(dm), 51.61(1)(g)4.

[10] Section § 51.61(1)(g)3., by contrast, permits but does not require such a report. *Compare* § 971.14(5)(am) ("A report on which the motion is based *shall* accompany the motion . . . ." (emphasis added)) *with* § 51.61(1)(g)3. ("A report, *if any*, on which the motion is based shall accompany the motion . . . ."(emphasis added)).

ordered involuntary medication for individuals committed exclusively under § 971.14.

¶11 This reading is also consistent with the statutory history of § 51.61(1) and related statutes, and how we have interpreted that history in the past. *See Serv. Emps. Int'l Union Healthcare Wis. v. WERC*, 2025 WI 29, ¶11, 416 Wis. 2d 688, 22 N.W.3d 876 ("Statutory history is therefore part of the statutory context and, where relevant, should be examined when a court determines the meaning of a statutory provision.").[11] When § 51.61(1) was first enacted, it applied only to individuals "admitted or committed" under chapter 51, a detailed statutory framework governing, among other things, the involuntary commitment of individuals who are mentally ill, proper subjects for treatment, and dangerous to themselves or others. *See* § 60, ch. 430, Laws of 1975; *see also Sheboygan County v. M.W.*, 2022 WI 40, ¶17, 402 Wis. 2d 1, 974 N.W.2d 733. The legislature later expanded the application of § 51.61(1) to include "any individual . . . who is detained, committed or placed under [ch. 51] or ch. 48, 55, 971, 975 or 980." § 51.61(1).[12] At the time, none of those chapters included their own provisions addressing competency to refuse medication. Since then, the legislature has enacted such provisions in chapters 55, 971, and 975,[13] but not in chapters 48 or 980.

¶12 This history was essential to our holding in *State v. Anthony D.B.*, a case closely related to this one. *See generally* 237 Wis. 2d 1. There we were asked whether § 51.61(1)(g)3. authorizes a circuit court to order the

---

[11] While legislative history can also shed light on a statute's meaning, there is no such relevant legislative history here. *See, e.g., Serv. Emps. Int'l Union Healthcare Wis. v. WERC*, 2025 WI 29, ¶32, 416 Wis. 2d 688, 22 N.W.3d 876.

[12] *See also* § 96, ch. 428, Laws of 1977 (adding chapters 55, 971, and 975); 1993 Wis. Act 479, § 16 (adding chapter 980); 1997 Wis. Act 292, § 309 (adding chapter 48).

[13] *See, e.g.,* WIS. STAT. §§ 55.14, 971.14(3)(dm), (4)(b), (5)(am), 975.06(7); *see also* 1989 Wis. Act 31, §§ 2848h, 2848t, 2850m, 2885m (adding medication provisions to chapters 971 and 975); 2005 Wis. Act 264, § 165 (adding medication provisions to chapter 55).

involuntary medication of an individual committed under chapter 980. *See* 237 Wis. 2d 1, ¶8. We read § 51.61(1)(g)3. in its full context, including the statutory history[14] outlined above, and concluded that it authorizes court-ordered involuntary medication of an individual committed under a chapter listed in § 51.61(1) "unless and until the legislature provides alternative provisions" in the relevant chapter.[15] *Id*., ¶20; *see also id*., ¶¶17–19. Because the legislature had not added separate involuntary-medication provisions to chapter 980, we accordingly held that "the provisions of § 51.61(1)(g) . . . control involuntary medication orders for persons committed under [that] chapter." *Id*., ¶20.

¶13    Here, by contrast, the legislature has added separate involuntary-medication provisions to § 971.14. We conclude that those provisions, rather than § 51.61(1)(g)3.'s first exception, govern court-ordered involuntary medication for individuals committed exclusively under § 971.14.[16] This reading of § 51.61(1)(g)3. takes into account its text,

---

[14] In *State v. Anthony D.B.*, we referred to this history as "legislative history." 2000 WI 94, ¶¶17, 20, 237 Wis. 2d 1, 614 N.W.2d 435. Since this history involves comparing statutes with prior enacted versions, however, it is actually statutory history. *See Brey v. State Farm Mut. Auto. Ins. Co.*, 2022 WI 7, ¶20, 400 Wis. 2d 417, 970 N.W.2d 1.

[15] The State argues that this "unless and until" statement is "best viewed as an imprecise articulation of the well-established rule that where closely-related statutes conflict, the more specific statute controls." Our interpretation of § 51.61(1)(g)3. in *Anthony D.B.*, however, was a contextualized reading of that statute's text in light of relevant statutory history and related provisions, and not the result of applying rules about how to interpret conflicting statutes. *See* 237 Wis. 2d 1, ¶¶17–20.

[16] The State also argues that *Sell* requires a § 971.14 committing court "to consider whether involuntary medication can be justified on dangerousness grounds before turning to [the] competency-restoration inquiry." *See also, e.g.*, 539 U.S. at 181–82 ("A court need not consider whether to allow forced medication for [the purpose of restoring trial competency], if forced medication is warranted for a *different* purpose, such as the purposes set out in *Harper* related to the individual's dangerousness . . . .") (emphasis in original); *id*. at 182 ("There are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds *before* turning to the trial competence question.") (emphasis in original). This argument assumes, however,

full statutory context (including the related provisions of § 971.14), and its statutory history, and is consistent with *Anthony D.B.*'s conclusion that § 51.61(1)(g)3. authorizes court-ordered involuntary medication of an individual committed under a chapter listed in § 51.61(1) "unless and until the legislature provides alternative provisions" in the relevant chapter. 237 Wis. 2d 1, ¶20.

¶14    Nevertheless, we emphasize that it is still possible to administer involuntary medication to individuals committed for competency restoration under § 971.14 who present a danger to themselves or others because of mental illness. For example, even though § 51.61(1)(g)3. does not authorize *court-ordered* involuntary medication of an individual committed under § 971.14 alone, it does permit medical professionals working with such an individual to administer medication on an involuntary basis when "a situation exists in which the medication or treatment is necessary to prevent serious physical harm to the individual or others."[17] § 51.61(1)(g)3. Additionally, the State may initiate commitment proceedings under WIS. STAT. § 51.20, a statute that specifically addresses commitment and treatment of individuals who are mentally ill, proper subjects for treatment, and dangerous to themselves or others. *See M.W.*, 402 Wis. 2d 1, ¶17. When involuntary medication of an individual committed for competency restoration is ordered on the basis of dangerousness, requiring a parallel commitment under § 51.20 respects the policy choices the legislature made and protects every individual's "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Harper*, 494 U.S. at 221; *see also Sell*, 539 U.S. at 180–81. Notably, this requirement would not delay the already paused criminal proceedings or result in any meaningful delay in the provision of involuntary medication based on dangerousness.[18]

---

that § 971.14 committing courts have statutory authority to order involuntary medication based on dangerousness in the first place. Section 971.14 does not provide that authority, and we hold that § 51.61(1)(g)3. does not do so either.

[17] Since this case involves only a court order for involuntary medication, we need not determine the parameters of this provision.

[18] When a criminal defendant is committed for competency restoration under § 971.14, the criminal proceedings are immediately suspended for the duration of the commitment. § 971.14(5)(a)1. Initiating a parallel proceeding under § 51.20 during the pendency of a § 971.14 commitment, therefore, would

IV

¶15     We hold that § 51.61(1)(g)3. does not authorize court-ordered involuntary medication of an individual committed exclusively under § 971.14. Because Naomi was committed solely under that section, we therefore conclude that § 51.61(1)(g)3. did not authorize the circuit court's involuntary-medication order in this case.

*By the Court.*—The decision of the court of appeals is affirmed.

---

not interrupt the progress of the criminal case. Further, when a petition for commitment under § 51.20 is filed, the circuit court must hold a probable-cause hearing within 72 hours. § 51.20(7)(a). If probable cause is found, the court may order involuntary medication based on dangerousness at that same hearing when additional requirements are met. *See* § 51.61(1)(g)2. Involuntary medication may also be administered based on dangerousness in emergency situations until the probable-cause hearing is held. *See* § 51.61(1)(g)1.

REBECCA GRASSL BRADLEY, J., concurring.

## I.  A DEFENSE OF TEXTUALISM

¶16     The majority relies on statutory history but the statutory text resolves the case and the analysis should stop there. WISCONSIN STAT. § 51.61(1)(g)3. does not authorize a criminal court to forcibly medicate a defendant based on dangerousness. The textualism espoused in *State ex rel. Kalal v. Circuit Court for Dane County* remains the bedrock of statutory interpretation in Wisconsin, and it controls this court's methods. 2004 WI 58, 271 Wis. 2d 633, 681 N.W.2d 110. The majority doesn't cite *Kalal*, and its omission is intentional. Loosening the primacy of the text and inserting other factors into the inquiry establishes a "totality of the circumstances" analysis, in which judges examine all the "evidence" and assign each piece varying weight based on subjective preferences. The majority's analysis, coming on the heels of repeated calls to replace textualism with a "holistic" approach represents another step toward analytical anarchy, giving judges leeway to reach whatever result they desire.

¶17     For more than two decades, this court has explicitly recognized the judiciary's role "to faithfully give effect to the laws enacted by the legislature." *Kalal,* 271 Wis. 2d 633, ¶44. This court does not divine legislative "intent" from legislative backstory. "Judicial deference to the policy choices enacted into law . . . requires that statutory interpretation focus primarily on the language of the statute." *Id.* The written text— currently enacted—is the law that binds the People and it is the law the judiciary is duty bound to apply. *See id.*, ¶44–46.

¶18     *Kalal* presented nothing new; the case expressed venerable principles of textualism uniformly followed until a fringe movement of jurists decided to twist the judicial power into a sword of social activism.[1] *See, e.g.,* 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF

---

[1] "Since the mid-20th century, legal theorists have been prodding judges to make policy" leading some judges to "'conform [their] decision[s] to what honest men would think right'" and to believe "'it is better for [them] to look into [their] own heart[s] to find out what that is.' This was not a parody." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 347 (2012).

ENGLAND 59 (1765) ("Words are generally to be understood in their usual and most known signification; not so much regarding the propriety of grammar, as their general and popular use."); "We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take the statute as we find it." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 347 (2012) (quoting *Anderson v. Wilson*, 289 U.S. 20, 27 (1933) (Carodozo, J.)). Since its inception, this court looked for the "intention of the legislature" in "the language employed in the act itself." *Haseltine v. Hewitt*, 61 Wis. 121, 124, 20 N.W. 676 (1884). If statutory text reveals "clear, plain language" there is "no room for construction or interpretation" by courts. *Id.* Far from charting a new course, *Kalal* chronicled, clarified and reaffirmed this court's longstanding practice. Wisconsin courts give text its "common, ordinary, and accepted meaning," read in context as part of a coherent statutory structure. *Kalal*, 271 Wis. 2d 633, ¶¶45–46; *see also* WIS. STAT. § 990.01(1); *Brey v. State Farm Mut. Auto. Ins. Co.*, 2022 WI 7, ¶11, 400 Wis. 2d 417, 970 N.W.2d 1. We start with the text and "[i]f the meaning of the statute is plain, we ordinarily stop the inquiry." *Kalal*, 271 Wis. 2d 633, ¶45 (citation omitted). Often, statutory interpretation starts and ends with the text.

¶19     Courts may consult all relevant intrinsic sources—including related statutes and statutory structure—to understand statutory meaning in the proper context. *Id.*, ¶¶43, 46, 48–49. Such sources illuminate the text of a provision, but do not displace it. Nothing in our jurisprudence supports a methodology of statutory interpretation that begins with anything but the text.

¶20     There are many debates over statutory interpretation. This is not one of them. Even "[p]urposivists begin with text." Victoria F. Nourse, *A Decision Theory of Statutory Interpretation*, 122 YALE L.J. 70, 90 (2012). "[W]e're all textualists now," Justice Kagan famously declared. HARVARD LAW SCHOOL, *The 2015 Scalia Lecture Series: A Dialogue with Justice Elena Kagan on the Reading of Statutes*, at 08:29 (YouTube, Nov. 25, 2015), http://youtube.com/watch?v=dpEtszFT0Tg. Even a leading article arguing courts should be "sensitive to current policy concerns" and that interpretation involves the "creation of meaning" concedes "the rule of law requires that statutes enacted by the majoritarian legislature be given effect" and that "[w]hen the statutory text clearly answers the interpretive question . . . it normally will be the most important consideration." William N. Eskridge, Jr., *Dynamic Statutory Interpretation*, 135 U. PA. L. REV. 1479, 1483, 1498 (1987) (cleaned up). Even those justices of this court who

have lobbied for a "holistic" interpretive approach have agreed "[w]e should *of course* start with the text of the statute." *Clean Wis., Inc. v. DNR*, 2021 WI 71, ¶43, 398 Wis. 2d 386, 961 N.W.2d 346 (Dallet, J., concurring) (emphasis added); *Servs. Emps. Int'l Union Healthcare Wis. v. WERC* (*SEIU*), 2025 WI 29, ¶55, 416 Wis. 2d 688, 22 N.W.2d 876 (Dallet, J., joined by Ann Walsh Bradley, C.J., and Karofsky, Protasiewicz, JJ., concurring) ("*Everyone, myself included, agrees* we should *of course* start with the text of the statute, since it is the best available evidence of what the statute means.") (emphasis added) (cleaned up) (citation omitted). Of course, the text is much more than "evidence" of meaning. "The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." SCALIA & GARNER, *supra*, at 56.

¶21 A study of this court's decisions since *Kalal* reveals the court does not often examine statutory history. As of March 31, 2026, this court has cited *Kalal* at least four-hundred and twenty times. After *Kalal*, only three opinions interpreting statutes ostensibly began their analyses with statutory history. *See generally Borek Cranberry Marsh, Inc. v. Jackson Cnty.*, 2010 WI 95, 328 Wis. 2d 613, 785 N.W.2d 615; *Richards v. Badger Mut. Ins. Co.*, 2008 WI 52, 309 Wis. 2d 541, 749 N.W.2d 581; *State v. Warbelton*, 2009 WI 6, 315 Wis. 2d 253, 759 N.W.2d 557.

¶22 One of those cases—*Borek*—should be overruled. *See Cobb v. King*, 2022 WI 59, ¶¶7–56, 403 Wis. 2d 198, 976 N.W.2d 410 (Rebecca Grassl Bradley, J., dissenting). *Borek* illustrates common pitfalls of statutory history. First, "[t]he Borek majority did not start with the statute's language." *Id.*, ¶22. Jurists who lend statutory history the same pedigree as text will lead with statutory history, if convenient. Second, jurists consulting statutory history—which should be limited to the comparison of currently-enacted text with earlier enactments—rarely analyze statutory history properly. *See Brey*, 400 Wis. 2d 417, ¶20 ("Statutory history . . . involves comparing the statute with its prior versions."). Purporting to analyze "statutory history," the *Borek* court adduced a New York intermediate appellate court's interpretation of a New York statute under the banner of "statutory history," as if it were intrinsic evidence of a Wisconsin statute's meaning. *Cobb*, 403 Wis. 2d 198, ¶¶30–35, 40. The court also dismissed certain amendments to the Wisconsin statute as "stylistic." *Id.*, ¶38. Finally, the *Borek* court primarily pursued an impossible search for nonexistent "legislative intent." *Id.*, ¶43–46; *State v. Lopez*, 2019 WI 101, ¶39, 389 Wis. 2d 156, 936 N.W.2d 125 (Rebecca Grassl Bradley, J., concurring) (citations omitted) (demonstrating

that a collective "intent" underlying the enactment of law is a fiction; individual legislators have their own motivations).

¶23    Statutory history is often ambiguous and therefore often offers only low-quality evidence of meaning. Failing to say much on it own, statutory history tempts jurists to draw upon other historical "evidence" to make sense of enactments and amendments, ultimately leading courts to stray down the path of divining legislative "intent." *See Warbelton*, 315 Wis. 2d 253, ¶29–30 (starting inappropriately with statutory history and using it incorrectly to infer legislative "intent"). It is impossible to "infer" that which does not exist.

¶24    In cases for which this court has examined statutory history since *Kalal*, the court has begun with currently-enacted text at least thirty-seven times. *E.g., Fleming v. Amateur Athletic Union of U.S., Inc.*, 2023 WI 40, ¶21, 407 Wis. 2d 273, 990 N.W.2d 244 ("As always, we begin with the text of the statute."); *Legue v. City of Racine*, 2014 WI 92, ¶62, 357 Wis. 2d 250, 849 N.W.2d 837 ("We look first to the text of the two relevant statutes."). Courts may use statutory history to verify a plain text analysis, but we always analyze the text first. *E.g., State v. Williams*, 2014 WI 64, ¶21, 355 Wis. 2d 581, 852 N.W.2d 467 (considering statutory history only after concluding "the language itself does not reveal a plain meaning"); *Force ex rel. Welcenbach v. Am. Fam. Mut. Ins. Co.*, 2014 WI 82, ¶¶55, 111, 356 Wis. 2d 582, 850 N.W.2d 866 (starting with "[a] study of the text" and proceeding to statutory history only after the court could not discern an answer from the text).

¶25    Abandoning the text in favor of a "holistic" methodology untethers courts from the rule of law and replaces neutral interpretation with results-oriented decision-making. *See, e.g., Clean Wis., Inc.*, 398 Wis. 2d 386, ¶88 (Rebecca Grassl Bradley, J., dissenting) (explaining that textualism is "rooted in and fundamental to the rule of law," because "[i]t is the <u>law</u> that governs, not the intent of the lawgiver" (quoting *Kalal*, 271 Wis. 2d 633, ¶52)) (emphasis original). Elevating any sources or other considerations over currently-enacted text invites judicial overreach by giving judges cover to substitute their policy preferences for the law. *Cath. Charities Bureau, Inc. v. LIRC* 2024 WI 13, ¶¶110–159, 411 Wis. 2d 1, 3 N.W.3d 666 (Rebecca Grassl Bradley, J., dissenting) *overruled on other grounds by Cath. Charities Bureau, Inc. v. Wis. Lab. & Indust. Rev. Comm'n*, 605 U.S. 238 (2025). Sources beyond the text itself serve only to confirm, not rewrite, the law. *SEIU*, 416 Wis. 2d 688, ¶¶36–47 (Rebecca Grassl Bradley, J., concurring). This court clarified in *SEIU* that we first analyze

"intrinsic" evidence of a statute's meaning, and "intrinsic sources [do] include . . . statutory history." *SEIU*, 416 Wis. 2d 688, ¶8 (citation omitted). We made that point only to emphasize our rejection of a "myopic focus on the singular statutory provision in question." *Id.*, ¶10. We explained it is "not necessary . . . for the language of a statute to be deemed ambiguous before a reviewing court looks at intrinsic sources such as [statutory] scope, [statutory] history, and [statutory] context." *Id. SEIU* did not, however, place all "intrinsic" evidence on equal footing, nor did it displace, downgrade, or depreciate the primary source of plain meaning—the text.

¶26 A judicial opinion may discuss statutory history, but (to state the obvious) an opinion is not history, and sometimes only an inaccurate recitation of it. This court's cases and party briefing often characterize this court's precedents *analyzing* statutory history as statutory history *itself*. Doing so lacks any foundation. Probative as precedent can be, it is not enacted text. It has not survived legislative compromises, bicameralism, or presentment. The legislature writes Wisconsin law, not this court.

¶27 The enacted text alone supplies the answer to the question presented to this court. Chapter 51 permits a circuit court to commit a subject based on dangerousness. Once a court commits a subject under ch. 51, WIS. STAT. § 51.61(1)(g)3. provides the committing court with authority to issue an involuntary medication order after a hearing and after finding the subject not competent to refuse medication. No statute authorizes a court to order involuntary medication predicated on a subject's "dangerousness" alone. Neither statutory history or precedent have anything relevant to contribute to the statutory analysis.

## II. WISCONSIN STAT. § 971.14 DOES NOT AUTHORIZE INVOLUNTARY MEDICATION BASED SOLEY ON DANGEROUSNESS.

¶28 WISCONSIN STAT. § 51.61(1)(g)3.—a patients' rights provision for individuals receiving mental health services—plainly does not authorize a criminal court to forcibly medicate a defendant based on dangerousness. Section 51.61(1)(g)3. delineates the rights of "patient[s]," including individuals "detained, committed or placed" under ch. 51 or ch. 971, among other statutes. WIS. STAT. § 51.61(1). Even when read in conjunction with WIS. STAT. § 971.14, § 51.61(1)(g)3. does not authorize a criminal court to forcibly medicate a defendant based on dangerousness. Section 971.14 authorizes criminal courts to order the involuntary

medication of defendants only to restore trial competency. A court-ordered stay of a medication order under § 971.14 may not be lifted under § 51.61(1)(g)3., which authorizes the involuntary administration of medication—by physicians—only if "a situation exists in which the medication or treatment is necessary to prevent serious physical harm to the individual or others." Nothing in § 51.61(1)(g)3. authorizes a ch. 971 court to order the involuntary administration of medication in response to an individual's dangerousness.

### A. Wisconsin Stat. § 971.14 IS LIMITED TO COMPETENCY RESTORATION.

¶29    WISCONSIN STAT. § 971.14 authorizes involuntary medication for the singular purpose of restoring a defendant's trial competency. Section 971.14 applies "whenever there is reason to doubt a defendant's competency to proceed." WIS. STAT. § 971.14(1r).[2] If the court finds a defendant incompetent but likely to regain competency with appropriate treatment, the court must suspend the criminal proceeding and commit the defendant to the Department of Health Services. WIS. STAT. § 971.14(5)(a)1.[3]

---

[2] WISCONSIN STAT. § 971.14(1r) provides:

**(1r)** PROCEEDINGS.

> **(a)** The court shall proceed under this section whenever there is reason to doubt a defendant's competency to proceed.

[3] WISCONSIN STAT. § 971.14(5)(a)1. provides:

**(5)** COMMITMENT.

**(a)**

> **1.** If the court determines that the defendant is not competent but is likely to become competent within the period specified in this paragraph if provided with appropriate treatment, the court shall suspend the proceedings and commit the defendant to the custody of the department for treatment for a period not to exceed 12 months, or the maximum sentence specified

¶30    WISCONSIN STAT. § 971.14 tethers both "treatment" and "commitment" solely to restoring a defendant's competency to stand trial. All subsections of § 971.14—from the initial examination under subsec. (2), to the reporting requirements in subsec. (3), to the commitment and treatment provisions in subsec. (4)—are all rooted in the restoration of trial competency. *See* WIS. STAT. § 971.14(2)–(4).[4] The only authorization for

---

for the most serious offense with which the defendant is charged, whichever is less.

[4] WISCONSIN STAT. § 971.14(3)(d)–(dm) provide:

**(3)** REPORT. The examiner shall submit to the court a written report which shall include all of the following:

. . .

**(d)** If the examiner reports that the defendant lacks competency, the examiner's opinion regarding the likelihood that the defendant, if provided treatment, may be restored to competency within the time period permitted under sub. (5) (a). The examiner shall provide an opinion as to whether the defendant's treatment should occur in an inpatient facility designated by the department, in a community-based treatment program under the supervision of the department, or in a jail or a locked unit of a facility that has entered into a voluntary agreement with the state to serve as a location for treatment.

**(dm)** If sufficient information is available to the examiner to reach an opinion, the examiner's opinion on whether the defendant needs medication or treatment and whether the defendant is not competent to refuse medication or treatment. The defendant is not competent to refuse medication or treatment if, because of mental illness, developmental disability, alcoholism or drug dependence, and after the advantages and disadvantages of and alternatives to accepting the particular medation

court-ordered medication under the chapter, § 971.14(3)(d)–(dm), explicitly ties involuntary medication to restoring trial competency. WIS. STAT. § 971.14(3)(d)–(dm) ("If the examiner reports that the defendant lacks competency, the examiner's [report shall include an] opinion regarding the likelihood that the defendant, if provided treatment, may be restored to competency."). Paragraphs (d)–(dm) do not say anything about dangerousness.

¶31     WISCONSIN STAT. § 971.14 alludes to dangerousness only once, in § 971.14(2),[5] which provides for court-ordered examination of a

---

or treatment have been explained to the defendant, one of the following is true:

1.  The defendant is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.

2.  The defendant is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness, developmental disability, alcoholism or drug dependence in order to make an informed choice as to whether to accept or refuse medication or treatment.

[5] WISCONSIN STAT. § 971.14(2) provides:

**(2)** EXAMINATION.

**(a)** The court shall appoint one or more examiners having the specialized knowledge determined by the court to be appropriate to examine and report upon the condition of the defendant.

. . .

**(f)** A defendant ordered to undergo examination under this section may receive voluntary treatment appropriate to his or her medical needs. The defendant may refuse medication and treatment except in a situation where the

defendant to evaluate trial competency—not dangerousness. While a defendant is under examination for trial competency, WIS. STAT. § 971.14(2)(f) authorizes a physician to involuntarily medicate a patient if "necessary to prevent physical harm to the defendant or others." WIS. STAT. § 971.14(2)(f) ("The defendant may refuse medication and treatment except in a situation where the medication or treatment is necessary to prevent physical harm to the defendant or others."). An examination under § 971.14(2) occurs before a final hearing and therefore before commitment. Nothing in ch. 971 authorizes involuntary medication after commitment.

## B.  THE LEGISLATURE'S SILENCE ON DANGEROUSNESS IN Wis. Stat. § 971.14 IS DELIBERATE.

¶32     Chapter 51, Wisconsin's general mental health commitment framework, comprehensively details the dangerousness findings a committing court may make under that chapter, comprising nine-hundred twenty-one words. WIS. STAT. § 51.20(1)(a)2.a.–e.[6] The hearings during

---

medication or treatment is necessary to prevent physical harm to the defendant or others.

[6] WISCONSIN STAT. § 51.20(1)(a)2.a.–e. provides:

> **2.**  The individual is dangerous because he or she does any of the following:
>
> **a.**  Evidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm.
>
> **b.**  Evidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm. . . .

c. Evidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals. The probability of physical impairment or injury is not substantial under this subd. 2. c. if reasonable provision for the subject individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services, if the individual may be provided protective placement or protective services under ch. 55, . . . Food, shelter or other care provided to an individual who is substantially incapable of obtaining the care for himself or herself, by a person other than a treatment facility, does not constitute reasonable provision for the subject individual's protection available in the community under this subd. 2. c.

d. Evidences behavior manifested by recent acts or omissions that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness. No substantial probability of harm under this subd. 2. d. exists if reasonable provision for the individual's treatment and protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services, if the individual may be provided protective placement or protective services under ch. 55, . . . Food, shelter or other care provided to an individual who is substantially incapable of obtaining the care for himself or herself, by any person other than a

treatment facility, does not constitute reasonable provision for the individual's treatment or protection available in the community under this subd. 2. d.

e. For an individual, other than an individual who is alleged to be drug dependent or developmentally disabled, after the advantages and disadvantages of and alternatives to accepting a particular medication or treatment have been explained to him or her and because of mental illness, evidences either incapability of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives, or substantial incapability of applying an understanding of the advantages, disadvantages, and alternatives to his or her mental illness in order to make an informed choice as to whether to accept or refuse medication or treatment; and evidences a substantial probability, as demonstrated by both the individual's treatment history and his or her recent acts or omissions, that the individual needs care or treatment to prevent further disability or deterioration and a substantial probability that he or she will, if left untreated, lack services necessary for his or her health or safety and suffer severe mental, emotional, or physical harm that will result in the loss of the individual's ability to function independently in the community or the loss of cognitive or volitional control over his or her thoughts or actions. The probability of suffering severe mental, emotional, or physical harm is not substantial under this subd. 2. e. if reasonable provision for the individual's care or treatment is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services or if the individual may be provided protective placement or protective services under ch. 55. Food, shelter, or other care that is provided to an individual who is

which ch. 51 courts make those findings must follow numerous procedural safeguards. WIS. STAT. § 51.20(5)–(13). The patients' rights provision of WIS. STAT. § 51.61 incorporates by express reference the § 51.20 hearing requirements and § 51.20(1)(a)2.a.–e. definitions of dangerousness. *See* WIS. STAT. § 51.61(1)(g)[7] (authorizing medication

---

substantially incapable of obtaining food, shelter, or other care for himself or herself by any person other than a treatment facility does not constitute reasonable provision for the individual's care or treatment in the community under this subd. 2. e. . . .

[7] WISCONSIN STAT. § 51.61(1)(g) provides:

**51.61 Patients rights.**

**(1)** In this section, "patient" means any individual who is receiving services for mental illness, developmental disabilities, alcoholism or drug dependency, including any individual who is admitted to a treatment facility in accordance with this chapter or ch. 48 or 55 or who is detained, committed or placed under this chapter or ch. 48, 55, 971, 975 or 980 . . . Except as provided in sub. (2), each patient shall:

. . .

**(g)** Have the following rights, under the following procedures, to refuse medication and treatment:

1. Have the right to refuse all medication and treatment except as ordered by the court under subd. 2., or in a situation in which the medication or treatment is necessary to prevent serious physical harm to the patient or to others. . . .

2. At or after the hearing to determine probable cause for commitment but prior to the final commitment order, other than for a subject individual who is alleged to meet the commitment standard under s. 51.20 (1) (a) 2.

e., the court shall, upon the motion of any interested person, and may, upon its own motion, hold a hearing to determine whether there is probable cause to believe that the individual is not competent to refuse medication or treatment and whether the medication or treatment will have therapeutic value and will not unreasonably impair the ability of the individual to prepare for or participate in subsequent legal proceedings. If the court determines that there is probable cause to believe the allegations under this subdivision, the court shall issue an order permitting medication or treatment to be administered to the individual regardless of his or her consent. The order shall apply to the period between the date of the issuance of the order and the date of the final order under s. 51.20 (13), unless the court dismisses the petition for commitment or specifies a shorter period. The hearing under this subdivision shall meet the requirements of s. 51.20 (5), except for the right to a jury trial.

3. Following a final commitment order, other than for a subject individual who is determined to meet the commitment standard under s. 51.20 (1) (a) 2. e., have the right to exercise informed consent with regard to all medication and treatment unless the committing court or the court in the county in which the individual is located, within 10 days after the filing of the motion of any interested person and with notice of the motion to the individual's counsel, if any, the individual and the applicable counsel under s. 51.20 (4), makes a determination, following a hearing, that the individual is not competent to refuse medication or treatment or unless a situation exists in which the medication or treatment is necessary to prevent serious physical harm to the individual or others. A report, if any, on which the motion is based shall accompany the motion and notice of motion and shall include a statement signed by a licensed physician that asserts that the subject individual needs medication or treatment and

13

without consent only when a committing court finds the patient "not competent to refuse," and incorporating "s. 51.20 (5)" hearing requirements expressly).

¶33 In contrast, WIS. STAT. § 971.14 makes no mention of judicial determinations of dangerousness, nor does it contain any procedural mechanism for courts to make or review dangerousness findings. The specificity with which the legislature defined dangerousness in WIS. STAT. § 51.20(1)(a)2.a.–e., juxtaposed with the total absence of any mention in § 971.14, is deliberate. When the legislature "speaks only of specific things and specific situations, it is a legitimate inference that the particulars exhaust the legislative will." SCALIA & GARNER, *supra*, at 108 (citation omitted). By negative implication, "when the [thing specified] can reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved," silence elsewhere means the legislature chose to omit that which does not appear in the text. *Id.* at 107 (emphasis original). The silence in § 971.14 on court-ordered medication for dangerousness is not for courts to fill. It represents a structural signal that only ch. 51 committing courts may order the involuntary medication of committees based on dangerousness, and the legislature withheld that authority from ch. 971 trial competency courts.

C. THE MEDICATION ORDERS THE STATE PROPOSES WOULD UNDERMINE CHAPTER 51'S SAFEGUARDS AND COMPROMISE LIBERTY.

¶34 The involuntary administration of psychotropic medication implicates a "significant liberty interest." *Washington v. Harper*, 494 U.S. 210, 221 (1990). The State may override that liberty interest only in limited circumstances and only with appropriate safeguards. If the State seeks

> that the individual is not competent to refuse medication or treatment, based on an examination of the individual by a licensed physician. The hearing under this subdivision shall meet the requirements of s. 51.20 (5), except for the right to a jury trial. At the request of the subject individual, the individual's counsel or applicable counsel under s. 51.20 (4), the hearing may be postponed, but in no case may the postponed hearing be held more than 20 days after a motion is filed.

forcible medication to restore a criminal defendant's trial competency, courts must apply the four-factor framework announced in *Sell v. United States*. 539 U.S. 166, 180–81 (2003) (requiring findings that (1) important governmental interests at stake; (2) "involuntary medication will *significantly further* those concomitant state interests"; (3) "involuntary medication is *necessary* to further those interests"; and (4) "administration of the drugs is *medically appropriate*"). If, on the other hand, the State seeks forced medication in response to dangerousness or based on medical necessity, the law permits medical professionals, acting in conformity with procedural safeguards, to administer such medication without running afoul of the Due Process Clause. *Harper*, 494 U.S. at 227, 231 ("[T]he Constitution does not prohibit the State from permitting medical personnel to make the decision under fair procedural mechanisms.") (citations omitted).

¶35 Involuntary medication to restore trial competency, and involuntary medication to maintain safety, involve distinct government interests and different procedures mandated by the Constitution (per *Sell* and *Harper*), and by the Wisconsin Statutes (under chs. 971 and 51). This court recognizes and applies those governing constitutional constraints. *See State v. Fitzgerald*, 2019 WI 69, ¶¶13–18, 387 Wis. 2d 384, 929 N.W.2d 165. Wisconsin statutes reflect the differences among the procedures to be followed when the government seeks the involuntary administration of medication to restore trial competency versus mitigating an individual's dangerousness. WISCONSIN STAT. § 971.14 outlines the framework for involuntary medication to restore trial competency, while ch. 51 governs the commitment of subjects for dangerousness, under WIS. STAT. § 51.20(1)(a)2.a.–e. After commitment, ch. 51 authorizes a committing court to order involuntary medication of a ch. 51 committee who has already been found dangerous. Even then, WIS. STAT. § 51.61(1)(g)3. requires the court to find the committee incompetent to refuse it. Chapter 51 otherwise permits only doctors to make administrative findings of dangerousness where medication is "necessary to prevent serious physical harm to the individual or others," under WIS. STAT. § 51.61(1)(g)–(h).[8] Reading § 971.14 to authorize court-ordered

---

[8] WISCONSIN STAT. § 51.61(1)(h) provides:

**(1)** . . . Except as provided in sub. (2), each patient shall:

medication based on a defendant's dangerousness would conflate two constitutionally and statutorily distinct schemes.

¶36     Reflecting the legislature's deliberate balance between public safety and the individual's liberty interest in refusing unwanted treatment, ch. 51 contains five statutory definitions of dangerousness, each tied to specific conduct, recency requirements, and evidentiary standards. *See* WIS. STAT. § 51.20(1)(a)2.a.–e. It also prescribes procedural safeguards, including timely probable cause and final hearings, the right to counsel, the right to present and cross-examine witnesses, advance access to medical reports, the right to choose an open or closed hearing, and judicial findings meeting statutory criteria—all before a subject may be committed and involuntary medication may be ordered. WIS. STAT. §§ 51.20(3), (5), (7), (9), (10), (13)(dm); 51.61(1)(g). The patients' rights provision set forth in WIS. STAT. § 51.61, does not offer an end run around a dangerousness finding mandated by § 51.20(1)(a)2.a.–e., the prerequisite to a ch. 51

. . .

> **(h)** Have a right to be free from unnecessary or excessive medication at any time. No medication may be administered to a patient except at the written order of a physician. The attending physician is responsible for all medication which is administered to a patient. A record of the medication which is administered to each patient shall be kept in his or her medical records. Medication may not be used as punishment, for the convenience of staff, as a substitute for a treatment program, or in quantities that interfere with a patient's treatment program. Except when medication or medical treatment has been ordered by the court under par. (g) or is necessary to prevent serious physical harm to others as evidenced by a recent overt act, attempt or threat to do such harm, a patient may refuse medications and medical treatment if the patient is a member of a recognized religious organization and the religious tenets of such organization prohibit such medications and treatment. The individual shall be informed of this right prior to administration of medications or treatment whenever the patient's condition so permits.

commitment and court-ordered involuntary administration of medication. WISCONSIN STAT. § 51.61(1)(h) grants *doctors* the authority to medicate to prevent serious physical harm to the individual or others, but only if "necessary," *see* § 51.61(1)(g)1., 3., and ultimately subject to administrative review. *See* WIS. STAT. § 51.61(5)–(7m).

¶37   WISCONSIN STAT. § 51.61(1)(g)3. preserves a patient's right to refuse medication following a final commitment *unless* one of two exceptions applies. *Winnebago Cnty. v. C.S.*, 2020 WI 33, ¶18, 391 Wis. 2d 35, 940 N.W.2d 875. The first clause of § 51.61(1)(g)3. authorizes a court, "following a hearing," to determine that an individual is not competent to refuse medication. The first exception, the court explained in *C.S.*, "is not linked to dangerousness." *Id.*, ¶28. The second clause overcomes the patient's right to refuse medication if "a situation exists in which the medication or treatment is necessary to prevent serious physical harm to the individual or others." *Id.*, ¶18.

¶38   The use of "unless" in WIS. STAT. § 51.61(1)(g)3. preceding each exception, together with the disjunctive "or" separating each exception, signals two independent exceptions, with courts controlling only the first exception. *See* SCALIA & GARNER, *supra*, at 116–25 (discussing the disjunctive "or"). Under the first exception, a court may order medication after a hearing and a finding of incompetence to refuse medication. The second exception says nothing about a court, a hearing, or any judicial determination. Reading the second exception to give a committing court an additional factual predicate for medication would rewrite the statute.

¶39   The structural and grammatical differences between the two clauses confirm their independent operation. The first exception is explicitly judicial; it references "the committing court" and a "hearing." *See* WIS. STAT. § 51.61(1)(g)3. The legislature drafted the second exception in the passive voice, omitting a decisionmaker. *Id.* That omission does not license the judiciary to make itself the decisionmaker. The very next section, WIS. STAT. § 51.61(1)(h), offers a textual clue regarding the identity of the decision-maker: "No medication may be administered to a patient except at the written order of a physician." The statute's structure comports with its grammar: one exception requires a court hearing to determine an individual's competence to refuse medication (after a WIS. STAT. § 51.20 dangerousness commitment, among others); the other concerns emergency circumstances requiring immediate medical intervention without first seeking judicial approval.

¶40   WISCONSIN STAT. § 51.61(1)(h) reinforces this distinction. Under that section, a patient may refuse medication on religious grounds except when medication "has been ordered by the court under par. (g) or is necessary to prevent serious physical harm." As in WIS. STAT. § 51.61(1)(g)3., these are two separate circumstances, with different decisionmakers. If courts could make necessity findings under the second clause of § 51.61(1)(g)3., the second clause in § 51.61(1)(h) would be redundant. The legislature's choice to repeat the necessity language beyond para. (g) confirms the administration of involuntary medication on an emergency basis is distinct from court-ordered medication based on incompetency. *See* SCALIA & GARNER, *supra*, at 174–79 (discussing the surplusage canon).

¶41   WISCONSIN STAT. § 51.61(1)(g)3. provides two separate factual predicates for overriding a patient's refusal of medication, two different decisionmakers, and two different procedural tracks. The first operates through structured judicial proceedings. The second operates through physicians' emergency authority, subject to review. The State's reading collapses these distinct avenues into an overriding judicial power untethered to the procedural protections of ch. 51. The text does not support the State's reading.

*1.   The First Exception to WIS. STAT. § 51.61(1)(g)3.: Courts*

¶42   The first exception in WISCONSIN STAT. § 51.61(1)(g)3. permits the involuntary administration of medication, post-commitment, after "a determination, following a hearing, that the individual is not competent to refuse medication." WIS. STAT. § 51.61(1)(g)3. Under that exception, psychotropic medication may be administered despite the patient's objection only if a court finds probable cause to believe the patient is incompetent to refuse. Section 51.61(1)(g)3. does not itself establish hearing procedures; instead, it incorporates them by reference. Following a final commitment order, the committing court must hold a hearing meeting the requirements of WIS. STAT. § 51.20(5) and find the committee "not competent to refuse medication." *See* WIS. STAT. § 51.61(1)(g)3. ("The hearing under this subdivision shall meet the requirements of s. 51.20 (5), except for the right to a jury trial."); *see also* WIS. STAT. § 51.20(5) (requiring "due process," "fair treatment," "the right to counsel," confrontation rights, the right to remain silent, and other rights). That hearing serves as a constitutional and statutory gatekeeper before a court may pierce a patient's right to refuse medication.

¶43 Nothing in the statutes permits a committing court under ch. 971 to use a physician's determination that the patient "needs medication or treatment" under WIS. STAT. § 51.61(1)(g)3. as a basis for ordering medication to ameliorate a defendant's dangerousness. WISCONSIN STAT. § 971.14(2)(f) provides, "[t]he defendant may refuse medication and treatment except in a situation where the medication or treatment is necessary to prevent physical harm to the defendant or others." Under that statute, physicians control the determination of necessity. Section 971.14(2)(f) gives doctors conducting trial competency examinations only limited authority to medicate *before* commitment. In contrast, WIS. STAT. § 51.61(1)(g)3. applies only "[f]ollowing a final commitment order." For this reason alone, WIS. STAT. § 971.14(2)(f) cannot be incorporated into WIS. STAT. § 51.61(1)(g)3. The first exception to patients' rights in § 51.61(1)(g)3. does not grant a ch. 971 committing court the authority to order medication based on dangerousness.

*2. The Second Exception to WIS. STAT. § 51.61(1)(g)3.: Physicians*

¶44 Under the second exception, WIS. STAT. § 51.61(1)(g)3. permits medication despite the patient's objection "in a situation within the hospital setting" if emergency treatment "is necessary to prevent serious physical harm to the patient or to others." *State ex rel. Jones v. Gerhardstein*, 141 Wis. 2d 710, 737, 416 N.W.2d 883 (1987). This clause does not mention a court, a hearing, or a judicial determination. The identity of the decisionmaker is supplied immediately afterward. Paragraph (h) provides, "[n]o medication may be administered to a patient except at the written order of a physician," and the attending physician is responsible for all medication administered. WIS. STAT. § 51.61(1)(h). Physicians, not courts, make these decisions in real time, and are subject to administrative grievance procedures and judicial review under § 51.61(5)–(7m).

¶45 Reading the second exception in WIS. STAT. § 51.61(1)(g)3. as falling under the judicial power would render WIS. STAT. § 51.61(1)(h) superfluous and conflate two distinct statutory pathways: structured judicial findings of incompetency in the first exception, and physician-ordered emergency intervention in the second exception. That distinction plainly appears in the text and structure of § 51.61, and reflects the legislature's balancing of individual liberty with urgent medical and safety needs.

¶46 The medical necessity clause of WIS. STAT. § 51.61(1)(g)3. must also be read *in pari materia* with other necessity exceptions in chs. 51 and 971. *State v. Harrison*, 2020 WI 35, ¶35, 391 Wis. 2d 161, 942 N.W.2d 310 (citing SCALIA & GARNER, *supra*, at 252 ("Statutes *in pari materia* are to be interpreted together, as though they were one law.")). The statutes authorize physicians to administer medication if "necessary to prevent serious physical harm" in at least three provisions in addition to § 51.61(1)(g)3., including WIS. STAT. § 51.61(1)(g)1.; WIS. STAT. § 51.61(1)(h); and WIS. STAT. § 971.14(2)(f).

¶47 All exceptions to patients' rights are written consistently with WIS. STAT. § 51.61(1)(g)3.—in the passive voice, and separated by a disjunctive "or" to distinguish between the two avenues for overriding a patient's right to refuse medication: (1) as ordered by a court after a hearing or (2) as ordered by a physician "to prevent serious physical harm" to the patient or others:

> WIS. STAT. § 51.61(1)(g)1.: "[E]ach patient shall . . . [h]ave the right to refuse all medication and treatment except as ordered by the court under subd. 2., *or* in a situation in which the medication or treatment is necessary to prevent serious physical harm to the patient or to others." (emphasis added).

> WIS. STAT. § 51.61(1)(g)3.: "[E]ach patient shall . . . have the right to exercise informed consent with regard to all medication and treatment unless the committing court or the court in the county in which the individual is located . . . makes a determination, following a hearing, that the individual is not competent to refuse medication or treatment *or unless* a situation exists in which the medication or treatment is necessary to prevent serious physical harm to the individual or others." (emphasis added).

> WIS. STAT. § 51.61(1)(h): "Except when medication or medical treatment has been ordered by the court under par. (g) *or* is necessary to prevent serious physical harm to others as evidenced by a recent overt act, attempt or threat to do such harm, a patient may refuse medications and medical treatment if the patient is a member of a recognized religious organization . . . ." (emphasis added).

If a patient's condition risks "serious physical harm" to the patient or others, doctors determine the necessity of medication without a court order, unless a court has already ordered medication. *See* WIS. STAT. § 51.61(1)(h) ("No medication may be administered to a patient except at the written order of a physician. The attending physician is responsible for all medication which is administered to a patient.").

¶48     WISCONSIN STAT. § 971.14(2) provides for physician-conducted examinations prior to competency hearings. While examining a defendant for trial competency, a physician may provide the defendant with "voluntary treatment appropriate to his or her medical needs." WIS. STAT. § 971.14(2)(f). "The defendant may refuse medication and treatment except in a situation where the medication or treatment is necessary to prevent physical harm to the defendant or others." *Id.* This exception again authorizes physicians to administer medication without a court order.

¶49     Where the legislature requires a *court* to deem involuntary medication "necessary," the statutory text does so expressly. *E.g.*, WIS. STAT. § 971.17(5).[9] Under chapter 971, if a person on conditional release

---

[9] WISCONSIN STAT. § 971.17(5) provides:

> **(5)** PETITION FOR TERMINATION. A person on conditional release, or the department of health services on his or her behalf, may petition the committing court to terminate the order of commitment. If the person files a timely petition without counsel, the court shall serve a copy of the petition on the district attorney and, subject to sub. (7) (b), refer the matter to the state public defender for determination of indigency and appointment of counsel under s. 977.05 (4) (j). If the person petitions through counsel, his or her attorney shall serve the district attorney. The petition shall be determined as promptly as practicable by the court without a jury. The court shall terminate the order of commitment unless it finds by clear and convincing evidence that further supervision is necessary to prevent a significant risk of bodily harm to the person or to others or of serious property damage. In making this determination, the court may consider, without limitation because of enumeration, the nature and circumstances of the crime, the person's mental history and current mental

who has been "found not guilty by reason of mental disease or defect" wishes to terminate his commitment, he may petition the court. *Id.* After a hearing, "[t]he court shall terminate the order of commitment unless it finds by clear and convincing evidence that further supervision is necessary to prevent a significant risk of bodily harm to the person or to others or of serious property damage." *Id.* Nothing in ch. 971 authorizes a court to order the involuntary administration of medication based on an individual's "dangerousness"; only ch. 51 gives courts that authority, and only after an individual has been committed—under ch. 51.

### D. CHAPTER 51 ALREADY PROVIDES A COMPLETE DANGEROUSNESS PATH TO INVOLUNTARY MEDICATION, RENDERING THE STATE'S § 971.14 READING REDUNDANT.

¶50 Section 971.14's silence is dispositive. Chapter 51 occupies the field of dangerousness-based court-ordered intervention. The legislature did not leave a gap for courts to fill. The State and circuit court created one with a misplaced motion and a hearing nowhere mentioned in the Wisconsin Statutes. Chapter 51 applies broadly to individuals who are detained, committed, or in custody, including those whose confinement arises from criminal proceedings. *See* WIS. STAT. §§ 51.20, 51.61. It defines dangerousness, prescribes the governing procedures, assigns responsibility between courts and medical professionals, and provides review mechanisms.

¶51 By contrast, WIS. STAT. § 971.14 serves a distinct and narrower purpose: restoring trial competency. Its structure, procedures, and treatment provisions are tied exclusively to that objective. Recognizing a post-commitment dangerousness pathway under § 971.14 would not fill a statutory gap; it would create a duplicative and procedurally unmoored alternative to ch. 51's carefully constructed framework.

---

condition, the person's behavior while on conditional release, and plans for the person's living arrangements, support, treatment and other required services after termination of the commitment order. A petition under this subsection may not be filed unless at least 6 months have elapsed since the person was last placed on conditional release or since the most recent petition under this subsection was denied.

¶52     Statutes should be read harmoniously, not to create overlapping and inconsistent systems. *See Kalal*, 271 Wis. 2d 633, ¶46. The State's reading would violate that principle, allowing courts to bypass ch. 51's procedures and safeguards governing determinations of dangerousness through a parallel pathway. The canon against surplusage counsels against inferring such redundancy because the legislature has already spoken comprehensively. *See* SCALIA & GARNER, *supra*, at 174–79.

¶53     The text of the Wisconsin Statutes resolves Naomi's appeal, with no need to consult statutory history or apply *Anthony D.B.*. Nothing in the law authorizes a WIS. STAT. § 971.14 committing court to invent a hearing for the purpose of medicating a defendant to ameliorate her dangerousness. Because the majority's analysis strays beyond the statutory text, I concur in the judgment.

ANNETTE KINGSLAND ZIEGLER, J., dissenting.

¶54    Justice is blind, but it should not turn a blind eye to the obvious. Naomi is not competent to proceed, in a criminal proceeding, and is irrefutably dangerous.[1] Naomi is charged with felony battery by a prisoner,[2] and the case is at a standstill until she regains competency. When a defendant is incompetent, it is the criminal court judge who, by statute, commits the defendant for treatment to regain competency. As a part of that effort to restore competency, the judge may also order the involuntary administration of medication. But the majority concludes that because Naomi's dangerousness was considered by the criminal court in ordering involuntary medication, that order is void. Not that Naomi cannot be involuntarily medicated, the majority says, but any such administration, which is part and parcel of returning her to competency and protecting those confined around her, can only be done by a doctor (without a court order) or ordered as part of a WIS. STAT. chapter 51-dual proceeding.[3]

---

[1] Naomi has previously been adjudicated dangerous; jailed for attacking another patient at an inpatient facility; she battered a nurse and a police officer while being treated at an inpatient facility; she was ordered by another judge in a separate criminal case to be treated at a different psychiatric facility for a different criminal case to restore her competency; she was secluded in jail for violent behavior; she attempted suicide; she refused medication to treat her potentially lethal thyroid condition; and has been treated for at least 45 different, violent episodes.

[2] The allegations of the complaint in this case are that Naomi was an inmate at the Milwaukee County jail for misdemeanor charges for striking a nurse and kicking a police officer while staying at a psychiatric facility. When a nurse at the jail tried to give Naomi her medication, Naomi battered the nurse. The State charged Naomi with felony battery by a prisoner.

[3] *See* majority op., ¶14 ("[E]ven though § 51.61(1)(g)3. does not authorize *court-ordered* involuntary medication of an individual committed under § 971.14 alone, it does permit medical professionals working with such an individual to administer medication on an involuntary basis when 'a situation exists in which the medication or treatment is necessary to prevent serious physical harm to the individual or others.' § 51.61(1)(g)3." (footnote omitted)).

¶55    The majority concludes that the criminal court cannot consider the dangerousness of a criminal defendant in an involuntary medication order, even though that defendant may reside in a local jail, prison, or institution where, not only returning the defendant to competency is important, but so too is the well-being of others. The majority nonetheless concludes that if the court considers the defendant's dangerousness to be relevant in an involuntary medication order, then a chapter 51 proceeding must be commenced. However, a chapter 51 civil proceeding differs significantly from a chapter 971 restoration of competency in a criminal matter. It is a separate case with different state actors and time limits, distinctive statutory conditions and proceedings, separate purposes and limitations, new lawyers, no victim rights obligations and, likely, a different judge. The apparent incompatibility between chapter 51 and chapter 971 undermines the purpose of expeditiously restoring competency in a criminal case and is likely unworkable in practice. Because the chapter 971 statutes clearly contemplate that the criminal court oversees returning a defendant to competency, and those statutes provide for court-ordered involuntary medication, I would not hamstring the criminal court judge from considering the dangerousness of the defendant who needs treatment, nor would I require a separate chapter 51 proceeding. I would not relegate the decision to regularly administer involuntary medication to medical professionals, who should only be administering involuntary medication in an emergency situation. In short, the criminal court judge should not be precluded from considering what best assists the restoration of competency or whether the defendant is dangerous, and chapter 971 contains no such prohibition.

¶56    Quite obviously, a criminal matter might involve a person who presents as dangerous and that person's liberty interests have been impacted by the criminal process. When that person is incompetent, a judge needs to attempt to restore the competency to proceed. Sometimes that involves the involuntary administration of medication for a person who is dangerous. Undoubtedly, a criminal defendant is free to refuse unwanted administration of antipsychotic medication, even while imprisoned. *Washington v. Harper*, 494 U.S. 210, 221–22 (1990). But that right is not absolute. *Id.* at 236. The dangerousness of a defendant must be a practical consideration in determining how best to proceed. When a defendant is incompetent to stand trial, the statutes endow the criminal court judge with the authority to order involuntarily medication, and considering a defendant's dangerousness should not be off limits. Because I disagree with the majority's analysis, I respectfully dissent.

## I. STATUTORY INTERPRETATION

¶57    Statutory interpretation "begins with the language of the statute." *State ex rel. Kalal v. Cir. Ct. for Dane Cnty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting *Seider v. O'Connell*, 2000 WI 76, ¶43, 236 Wis. 2d 211, 612 N.W.2d 659). That is because the legislature's intent is evidenced by the plain meaning of the statutes. *Id.*, ¶43. Context matters. *Id.*, ¶46. Since words connote different meanings based on how they are used, we also consider the statute's context and structure since both are "important to meaning." *Id.* "Therefore, statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.* We read the statute's language "where possible to give reasonable effect to every word, in order to avoid surplusage." *Id.* Therefore, a host of canons guide our interpretation.

¶58    We begin with the text. Wisconsin's Mental Health Act—specifically, WIS. STAT. § 51.61(1)(g)3.—states that patients

> [f]ollowing a final commitment order, other than for a subject individual who is determined to meet the commitment standard under s. 51.20(1)(a)2.e., have the right to exercise informed consent with regard to all medication and treatment unless the committing court or the court in the county in which the individual is located, within 10 days after the filing of the motion of any interested person and with notice of the motion to the individual's counsel, if any, the individual and the applicable counsel under s. 51.20(4), makes a determination, following a hearing, that the individual is not competent to refuse medication or treatment or unless a situation exists in which the medication or treatment is necessary to prevent serious physical harm to the individual or others.

WIS. STAT. § 51.61(1)(g)3. Citizens reading this statute would understand that the statute authorizes courts committing a defendant for competency under WIS. STAT. § 971.14 to order involuntary medication to address a defendant's dangerousness at an institution. *See* JOSEPH RAZ, INTENTION IN INTERPRETATION, IN THE AUTONOMY OF LAW: ESSAYS ON LEGAL POSITIVISM 249, 268 (Robert P. George ed., 1996) (explaining that statutes are written

for ordinary citizens to understand them). A cursory reading of the statute's plain language could resolve this case.

¶59    But merely reading the statute may be insufficient for a plain-meaning analysis. *Kalal*'s statutory interpretation methodology includes several canons of construction that explain the text's semantics using basic rules of English. For example, the Whole-Text canon requires us to determine the plain meaning of a statute's text considering the language of the entire statute—not just isolated portions. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012); *see also Alberte v. Anew Health Care Servs., Inc.*, 2000 WI 7, ¶10, 232 Wis. 2d 587, 605 N.W.2d 515 (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51 (1987)) ("While it is true that statutory interpretation begins with the language of the statute, it is also well established that courts must not look at a single, isolated sentence or portion of a sentence, but at the role of the relevant language in the entire statute."). When we interpret statutes "in relation to the language of surrounding or closely-related statutes," we find that the statutes as a whole do not require what the majority commands. *Kalal*, 271 Wis. 2d 633, ¶46.

¶60    Similarly, the Related-Statutes canon provides that "laws dealing with the same subject—being *in pari materia* (translated as 'in a like matter')—should if possible be interpreted harmoniously." SCALIA & GARNER, *supra*, at 252. As this court has repeatedly recognized, "[w]hen construing several statutes that deal with the same subject, it is our duty to give each provision full force and effect." *State v. Anthony D.B.*, 2000 WI 94, ¶11, 237 Wis. 2d 1, 614 N.W.2d 435; *see State v. Reyes Fuerte*, 2017 WI 104, ¶29, 378 Wis. 2d 504, 904 N.W.2d 773 ("Where multiple statutes are at issue, this court seeks to harmonize them through a reasonable construction that gives effect to all provisions."). Only when there is an unavoidable "conflict between statutes" does the more specific provision control. *Reyes Fuerte*, 378 Wis. 2d 504, ¶29; *see Anthony D.B.*, 237 Wis. 2d 1, ¶11; SCALIA & GARNER, *supra*, at 180, 183. Applying this canon reveals that similar cases involving incompetence have authorized courts to involuntarily medicate incompetent patients after they have been found dangerous. For example, *Anthony D.B.* held that WIS. STAT. § 51.61(1)(g)3. authorized a WIS. STAT. ch. 980 court to order involuntary medication to address dangerousness. 237 Wis. 2d 1, ¶¶11, 26. The majority fails to persuasively explain its departure from precedent.

¶61    Moreover, the Presumption Against Ineffectiveness canon favors "interpretation[s] that further[] rather than obstruct[] the

document's purpose." SCALIA & GARNER, *supra*, at 63. "This canon follows inevitably from the facts that (1) interpretation always depends on context, (2) context always includes evident purpose, and (3) evident purpose always includes effectiveness." *Id.* Here, too, the majority's interpretation fails. The statute is written to allow circuit court judges to determine the need and methods to restore an individual to competency. It grants the court two pathways: (1) The court could order the defendant to undergo a hearing to ascertain the defendant's need for restoration and make a judgment; or (2) it could find that a dangerous situation exists demanding the need to administer medication and treatment involuntarily. Either way, the court acts within its power. Preventing the court from acting under its statutorily granted authority "contravenes the manifest purpose of the statute" making that interpretation "unreasonable." *State v. Dinkins*, 2012 WI 24, ¶29, 339 Wis. 2d 78, 810 N.W.2d 787. Interpretations that produce absurd results are at odds with the legislature's intent. *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527 (1989) (Scalia, J., concurring in the judgment). They are disfavored.

¶62   These methods reveal the meaning of a statute. If, by employing these methods, the plain meaning of the statute is clear, then we may not "disregard the plain, clear words of the statute." *Kalal*, 271 Wis. 2d 633, ¶46 (citation omitted). Accordingly, our analysis begins with the pertinent sections of the statutes. Then, we utilize our canons of construction to ascertain the statutes' plain meaning which, here, allows a criminal court to consider dangerousness when ordering involuntary medication to restore a defendant to competency. The statutes do not preclude that consideration.

## II. DISCUSSION

¶63   WISCONSIN STAT. § 971.14 directs a criminal court when competency has become an issue and works conjunctively with chapter 51. Chapter 51 of the Wisconsin Statutes is Wisconsin's State Alcohol, Drug Abuse, Developmental Disabilities and Mental Health Act. WISCONSIN STAT. § 51.61 is entitled, "Patients Rights." Section 51.61 applies to § 971.14 committees. *See* WIS. STAT. § 51.61(1) (defining "patient" as "any individual who is receiving services for mental illness . . . including any individual who is . . . detained, committed or placed under this chapter or ch. . . . 971.").

¶64   WISCONSIN STAT. § 51.61(1) enumerates certain rights that all patients have. Specifically, patients have the "right to be informed of

[their] treatment and care and to participate in the planning of [their] treatment and care." WIS. STAT. § 51.61(1)(fm). Patients may also refuse medication "except as ordered by the court under [§ 51.61(1)(g)2.], or in a situation in which the medication or treatment *is necessary to prevent serious physical harm to the patient or to others,*" while they are committed under WIS. STAT. ch. 971. § 51.61(1)(g)1. (emphasis added). Patients may also refuse medication

> [f]ollowing a commitment order . . . unless the committing court . . . makes a determination, following a hearing, that the individual is not competent to refuse medication or treatment or *unless a situation exists in which the medication or treatment is necessary to prevent serious physical harm to the individual or others.*"

§ 51.61(1)(g)3. (emphasis added). Both of these subdivisions of § 51.61(1)(g) explicitly carve out exceptions to a patient's right to refuse medication when it "is necessary to prevent serious physical harm" to the patient/individual or to others. WIS. STAT. § 971.14; § 51.61(1)(g)1., 3. In other words, the individual may be medicated against their refusal when they are dangerous.

¶65 Section 971.14 cannot be considered in a vacuum. It must be interpreted in light of the statutory scheme and whole text, the entirety of the related statutes, and presumed to give each statutory section its full force and effect. *Kalal*, 271 Wis. 2d 633, ¶46. Naomi's interpretation does none of these things. Instead, she concedes that some provisions of § 971.14 apply to her, but that other provisions do not. Conveniently, it is the dangerousness reference that she says is no longer applicable. Without this parsing of the statute, however, her argument fails. Without legislative direction deeming this subsection inapplicable, we should be wary of her interpretation.

¶66 The United States Supreme Court has determined that addressing an individual's dangerousness in an institution may override an individual's liberty interest in refusing medication. *Harper*, 494 U.S. at 221–27. Importantly, the Court has instructed trial courts to consider whether an individual's involuntary medication can be justified on dangerousness grounds before considering *Sell*'s return-to-competency standards. *Sell v. United States*, 539 U.S. 166, 181–83 (2003).

¶67     In this case, WIS. STAT. § 51.61(1)(g)3.'s provisions explicitly apply to individuals committed under WIS. STAT. ch. 971. *See* § 51.61(1). Together, the two statutes allow the court to order involuntary medication for different reasons. On one hand, WIS. STAT. § 971.14 includes involuntary medication provisions to help restore a committee's trial competency. On the other hand, § 51.61(1)(g) addresses involuntary medication for dangerousness in an institution.

¶68     Moreover, WIS. STAT. §§ 971.14 and 51.61 are closely related. Section 51.61 explicitly references chapter 971, and a chapter 971 committing court considers the defendant as a patient endowed with all of the rights and protections provided under § 51.61. *See Reyes Fuerte*, 378 Wis. 2d 504, ¶27 (indicating that statutes are closely related when one references another); *Anthony D.B.*, 237 Wis. 2d 1, ¶11 (treating chapters 980 and 51 as closely related because they "both govern individuals committed as sexually violent persons"). In other words, both § 51.61 and § 971.14 govern criminal defendants who need to be returned to competency.

¶69     And, these sections do not conflict. Rather, they work conjointly. Tools of statutory construction encourage us to look for a harmonious reading of these statutes. *Eau Claire Cnty. DHS v. S.E.*, 2021 WI 56, ¶30, 397 Wis. 2d 462, 960 N.W.2d 391. A harmonious reading demonstrates that the legislature considered that WIS. STAT. § 971.14 committing courts would need to involuntarily medicate a dangerous committee. Nowhere does the text indicate that a second commitment under chapter 51 is needed. If it did, *Anthony D.B.* would need to be overturned, which the majority is not doing. This interpretation should be favored to give the plain meaning of both statutes their "full force and effect." *Anthony D.B.*, 237 Wis. 2d 1, ¶11.

¶70     Stated differently, the text makes it clear that WIS. STAT. § 51.61(1)(g)3. authorizes WIS. STAT. § 971.14 courts to issue involuntary medication orders for a committee who is dangerous. Under § 51.61, chapter 971 committees are patients. Patients may refuse medication or treatment "unless the committing court . . . makes a determination, following a hearing, that the individual is not competent to refuse medication or treatment or *unless a situation exists in which the medication or treatment is necessary to prevent serious physical harm to the individual or others*." § 51.61(1)(g)3. (emphasis added). Because Naomi, as a § 971.14 committee, is a "patient" under § 51.61(1)(g)3., the "specific procedures for involuntary medication" set forth under § 51.61(1)(g)3. apply to her. And,

under § 51.61(1)(g)3., when a physician determines that the patient "needs medication or treatment and that the individual is not competent to refuse medication or treatment," the chapter 971 court must address the "needs of the patient," which can include medication for dangerousness. *Anthony D.B.*, 237 Wis. 2d 1, ¶¶13–15. The "needs" of a § 971.14 committee/patient may include an involuntary medication order, which, as we know, the legislature provided for at a very early stage in the § 971.14 proceeding based on the text which states that "[t]he defendant may refuse medication and treatment except in a situation where the medication or treatment is necessary to prevent physical harm to the defendant or others." § 971.14(2)(f).

¶71   Employing our *Kalal*-required canons bolsters a conclusion contrary to that of the majority. Simply stated, the language of the statutes cross-reference and incorporate each other. When read as authorizing the committing court to involuntarily medicate a patient at different stages in the proceeding, the statutes work harmoniously. There is simply no indication that the legislature exacted out one portion of a specifically included subsection of a statute to require dual proceedings and tie the hands of the criminal court. Considering that both statutes govern incompetent individuals, WIS. STAT. § 971.14 is closely related to WIS. STAT. § 51.61. *See Reyes Fuerte*, 378 Wis. 2d 504, ¶27; *Anthony D.B.*, 237 Wis. 2d 1, ¶11. When viewed through that lens, the legislature allowed chapter 971 committing courts to order involuntary medication to address dangerousness. And, that also makes sense. Instead of pausing the criminal case and waiting for who knows how long for a separate chapter 51 case to begin and end, the legislature provided for the criminal court to be able to restore a defendant's competency and address the dangerousness of a defendant who likely is also housed with other people who deserve to not be subjected to the committee's dangerousness. Harmonizing the provisions, rather than inviting unnecessary conflict, is a sound method of statutory construction and militates in favor of allowing involuntary medication under the plain meaning.

¶72   This plain-meaning analysis is supported by *Anthony D.B.*. In *Anthony D.B.*, a criminal defendant was "committed as a sexually violent person" under WIS. STAT. ch. 980 (1995-96). *Anthony D.B.*, 237 Wis. 2d 1, ¶2. The committee was previously convicted of sexual assault, "committed under WIS. STAT. § 971.17," and adjudicated "not competent to refuse medication." *Id.* The committee's treating physician testified that the committee "suffered from a mental disease and was dangerous when not medicated" and "that involuntary medication was necessary to protect

Anthony D.B. from himself, and to protect others from him." *Id.,* ¶4. Rather than requiring the state "to initiate commitment proceedings under WIS. STAT. ch. 51 before seeking an order for involuntary medication," we held that that "[t]he underlying purpose for civil commitment, including commitment under WIS. STAT. ch. 980, 'is to treat the individual's mental illness and protect him and society from his potential dangerousness.'" *Id.,* ¶¶5, 10, 12 (quoting *State v. Post*, 197 Wis. 2d 279, 308, 541 N.W.2d 115 (1995)). We concluded that "[t]he legislature has provided that these individuals are to have the statutory rights under WIS. STAT. § 51.61, pursuant to the inclusion of individuals committed under WIS. STAT. ch. 980 in § 51.61(1)." *Id.,* ¶15. Accordingly, "the rights extended to patients civilly committed under ch. 51 were extended to patients who are criminally committed." *Id.,* ¶17. And "the procedures in WIS. STAT. § 51.61 apply unless and until the legislature provides alternative provisions." *Id.,* ¶20.

¶73 As with Naomi's case, the answer is found by reading WIS. STAT. ch. 971 alongside WIS. STAT. § 51.61. *See id.,* ¶24 (reading "WIS. STAT. ch. 980 together with § 51.61"). The reference to chapter 971 in § 51.61— like the reference to chapter 980 in § 51.61—endows the court with the right to issue an involuntary medication order for dangerousness. *Id.,* ¶15; *see also State v. Jeremiah C.,* 2003 WI App 40, ¶17, 260 Wis. 2d 359, 659 N.W.2d 193 (explaining that the Related-Statutes canon "refers to statutes and regulations relating to the same subject matter or having a common purpose" and that "[t]he statutory construction doctrine of *in pari materia* requires a court to read, apply and construe statutes relating to the same subject matter together"). Because we have already interpreted the propriety of involuntary medication orders after a finding of dangerousness in § 51.61 in similar contexts, the same conclusion should apply here.

¶74 Just like in *Anthony D.B.,* the Department of Health Services sought an involuntary medication order to address Naomi's dangerousness. Like in *Anthony D.B.,* Naomi's doctor testified that she needed medication because she was dangerous to herself and others. The committing court found that Naomi was dangerous and incompetent to refuse medication. Then, the court ordered her to be involuntarily medicated, exactly as the defendant in *Anthony D.B.* Thus, the statutory interpretation arguments she makes have been conclusively decided in *Anthony D.B.,* and at a minimum, that precedent undercuts the conclusions reached by the majority.

¶75    This interpretation of WIS. STAT. § 51.61(1)(g)3. should be favored to give the plain meaning of both statutes their "full force and effect." *Anthony D.B.*, 237 Wis. 2d 1, ¶11. On the other side of the table is the majority's interpretation, which does not give effect to the provisions of § 51.61(1)(g)3. The majority assumes that when the legislature added a provision to restore competency in WIS. STAT. § 971.14 but did not add a provision for dangerousness, it meant what it did not say. When the legislature added this language to § 971.14, it did not disallow the applicability of § 51.61(1)(g)3. The legislature is presumed to understand the statutes as they are in place, and if it intended to remove dangerousness, it knows how to do so. Instead, the legislature left the reference and incorporation language untouched. Statutory construction militates against the majority in this regard as well.

¶76    To be clear, Naomi agrees that WIS. STAT. § 51.61 applies, but she prefers that only some provisions apply to individuals committed under WIS. STAT. § 971.14. She does not want the court-authorization portion of § 51.61(1)(g)3. to apply to her. Her disagreement lies in what she calls the "emergency" exception of the statute. In her view, only the first portion of § 51.61(1)(g)3. gives committing courts the power to order involuntary medication. The second portion, in her opinion, is left to her treating physician to decide. She is wrong. The second exception is merely an alternative that circuit courts may consider. In the absence of a conflict between sections 51.61(1)(g)3. and 971.14, and the ability to read each statute harmoniously without rendering one ineffective, adopting her position should be too far a stretch for this court to entertain. Absent legislative mandate, one cannot pick and choose which portions of a statute they would like to apply.

¶77    In short, WIS. STAT. § 51.61(1)(g)3. seems to explicitly authorize courts to involuntarily medicate a chapter 971 committee under certain circumstances. The emergency portion of that statute specifically references dangerousness as a proper basis on which to seek court authorization. The majority, instead of harmonizing the statutes, qualifies the applicability of § 51.61(1)(g)3. to exclude the authorization portion of the statute. There is virtually no tool of statutory interpretation to support segregating these provisions and excising one. The majority makes no attempt to harmonize these clearly-related statutes. Where related statutes do not conflict, they are to be given full force and effect. The majority can identify no conflict. By § 51.61(1)(g)3.'s unequivocal applicability to § 971.14, the legislature has endowed criminal courts with the power to consider other "needs" for medication, such as dangerousness. Thus,

dangerousness is certainly a valid consideration for a criminal defendant who needs involuntary medication to regain competency.

### III. CONCLUSION

¶78 Today, the majority upends statutory direction which provides a criminal court with the authority to return a criminal defendant to competency. It instead concludes that if a defendant is dangerous, the only way to forcibly medicate a criminal defendant to competency is to require a second, separate WIS. STAT. ch. 51 commitment. The only other option is to rely on a medical professional to administer medication without any court supervision. Neither of these options is satisfactory, nor are they required. The court's result supplants the legislative authority granted in the criminal proceeding. The plain language of the statute, read in context within the whole statutory scheme, does not mandate this contorted result, which is contrary to the legislature's intent and practical considerations. The majority's preference for a dual commitment is simply not required by sound statutory construction principles. A circuit court's ability to forcibly medicate a patient under chapter 51 applies "unless and until the legislature provides alternative provisions." *Anthony D.B.*, 237 Wis. 2d 1, ¶20. Here, the legislature has done no such thing. In short, the plain language of WIS. STAT. § 971.14 does not strip away the circuit court's ability to consider dangerousness as a basis for administering medication to a criminal defendant involuntarily.

¶79 Because criminal courts are granted broad authority and are not precluded from considering dangerousness in restoring a defendant to competency, and have the authority to issue necessary involuntary medication and treatment orders, I respectfully dissent.